UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

RUTH CALDERON-CARDONA, *et al.*,

                      Petitioners / Judgment-
                      Creditors,

         - against -

JP MORGAN CHASE BANK, N.A.,

                   Respondent /Garnishee.

--------------------------------------------------------------------X

And consolidated actions

--------------------------------------------------------------------X

Docket nos.:

11-CV-3283 (DLC)
11-CV-3291 (DLC)
11-CV-3290 (DLC)
11-CV-3292 (DLC)
11-CV-3289 (DLC)
11-CV-3284 (DLC)
11-CV-3288 (DLC)
11-CV-3286 (DLC)
11-CV-3285 (DLC)

Judgment No. 10,1746

## PETITIONERS/JUDGMENT CREDITORS' MEMORANDUM IN REPLY TO RESPONDENTS/GARNISHEES' OPPOSITIONS TO THE ORDER TO SHOW CAUSE

## INTRODUCTION

        The Petitioners/Judgment-Creditors respectfully submit this brief in response to the various submissions made by the Respondent stakeholders in these consolidated turnover proceedings.

        While the Garnishees have expended considerable resources in opposing this proceeding, their arguments are, as shown below, much ado about nothing. Indeed, it appears that Garnishees are seeking, as some of them have done in related cases, to

retain custody of assets that do not belong to them and that Congress has determined should be used to satisfy judgments against state sponsors of terrorism:

> Respondents would have this Court leave the assets in private hands and grant them indefinite possession, and potential beneficial use of the funds, for what could be years, decades, or even centuries. In the meantime, while the blocked funds would lie idle in the banks' vaults, benefitting no one except the financial institutions, claimants holding judgments against designated terrorist states and seeking to redress heinous crimes would remain thwarted in their efforts to obtain due compensation.

*Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 538-539 (S.D.N.Y. 2010).

It is respectfully submitted that the arguments advanced by the Respondents are the result of a concerted effort to throw a wrench in the works. At the end of the day, there is no justifiable reason why these Respondent stakeholders should be permitted retain custody of money that is not theirs in perpetuity and in doing so thwart the collection efforts of American victims of state-sponsored terrorism who have obtained a valid judgment entitling them to enforcement against these assets.

## RELEVANT BACKGROUND

The Petitioners are the family members and the representatives of the estates of United States nationals who were murdered or otherwise harmed as the result of a terrorist attack carried out in Israel's Lod Airport on May 30, 1972. The terrorist attack was executed by the Japanese Red Army and Popular Front for the Liberation of Palestine terrorist organizations using material support and resources provided by the

Democratic People's Republic of North Korea ("North Korea") and North Korea's main intelligence agency, the Cabinet General Intelligence Bureau ("CGIB").

Petitioners brought a civil action for damages against North Korea and the CGIB in the United States District Court for the District of Puerto Rico under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. *Calderon-Cardona v. Democratic Republic of North Korea,* Civ. No. 08-1367 (D.P.R.). After conducting a fact-finding hearing as required by FSIA § 1608(e), on July 16, 2010 the U.S. District Court for the District of Puerto Rico issued an Opinion and Order finding North Korea and the CGIB jointly and severally liable for Petitioners' injuries, and directing entry of final judgment against North Korea and the CGIB and in Petitioners' favor for compensatory and punitive damages in the total amount of $378 million. *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D. Puerto Rico 2010). (Exhibit A to the Petition herein). An amended final judgment in favor of the Petitioners was entered by the Puerto Rico federal court, pursuant to the July 16, 2010 Opinion and Order, on August 5, 2010. (Exhibit B to the Petition herein). ("Judgment"). The Judgment awards compensatory damages in favor of the Petitioners totaling $78 million, as well as $300 million in punitive damages, against North Korea and the CGIB. The Judgment remains entirely unsatisfied.

On or about October 8, 2010, the Judgment was registered in this Court pursuant to 28 U.S.C. § 1963, and was assigned judgment number 10,1746. (Exhibit B to the Petition herein). Petitioners served a subpoena on the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury seeking a "list containing the

names and addresses of all financial institutions that, as of June 30, 2010, had reported to the Office of Foreign Assets Control assets blocked pursuant to sanctions against North Korea, see 31 C.F.R. 500.201 and Executive Order 13466." (Exhibit C to the Petition herein). In response to that subpoena, OFAC produced a list of "financial institutions [that] have reported to the Office of Foreign Assets Control that they hold assets blocked pursuant to sanctions against the Democratic Republic of North Korea, see 31 C.F.R. 500.201 and Executive Order 13466" (Exhibit D to the Petition herein).

Each of the respondents herein has reported to OFAC that it holds assets blocked pursuant to sanctions against North Korea.

In this proceeding, petitioners seek to enforce their judgment against these assets pursuant to TRIA § 201 and FSIA § 1610(g).

## ARGUMENT

### A.    The Effect of TRIA § 201 and FSIA § 1610(g)

The original state sponsor of terrorism exception of the FSIA, 28 U.S.C. § 1605(a)(7), was enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act. Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241.

As unsatisfied judgments against foreign state sponsors of terrorism (primarily Iran) began to accumulate, Congress stepped into the breach:

> In view of the challenges that plaintiffs encountered in their efforts to execute judgments against the assets of state sponsors of terrorism here in the United States, Congress did make a number of efforts on behalf of the victims of terrorism to free up blocked assets for judgments under § 1605(a)(7). The first law enacted as part of this effort to free

> up assets of state sponsors of terrorism was…codified at
> § 1610(f)(1)(A)[]. That measure created a new exception –
> § 1610(f) – which allowed for the first time attachment and
> execution against blocked assets of state sponsors of
> terrorism. When Congress passed this measure, however, it
> also provided that the President could waive the provision
> "in the interest of national security." § 1610(f)(3). Upon
> signing the bill into law, President Clinton exercised that
> waiver authority.

*In re Islamic Republic of Iran Terrorism Litigation*, 659 F. Supp. 2d 31, 55-56 (D.D.C. 2009).

(Footnote omitted).

In 2002, Congress again acted to assist American victims of terrorism

holding judgments against state sponsors of terrorism by passing the Terrorism Risk

Insurance Act ("TRIA"):

> In the TRIA…Congress finally succeeded in subjecting the
> assets of state sponsors of terrorism to attachment and
> execution in satisfaction of judgments under § 1605(a)(7). *See*
> § 201. The TRIA provides that "[n]otwithstanding any other
> provision of law," the blocked assets of a terrorist state are
> subject to attachment or execution to the extent of any
> compensatory damages awarded against that state under the
> FSIA terrorism exception. *Id.*…the TRIA has opened a wide
> range of blocked assets to attachment and execution by the
> judgment creditors of state sponsors of terrorism. Thus, the
> TRIA appears to represent something of a victory for these
> terrorism victims – whose interests have been most
> vigorously advanced by members of Congress – over the
> longstanding objections of the Executive Branch.

*In re Islamic Republic of Iran,* 659 F. Supp. 2d at 57-58.

Section 201 of TRIA entirely revolutionized enforcement of judgments

against foreign state sponsors of terrorism by abrogating the "presumption of

separateness" between foreign states and their agencies and instrumentalities that was recognized in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*") and allowing the execution of such judgments against the assets of the agencies and instrumentalities of such foreign states. *See e.g. Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272, 276 (E.D.N.Y. 2009) ("[T]his Court concludes that TRIA § 201(a) obviates the application of *Bancec* to a determination of whether the blocked assets of…an agency or instrumentality of a terrorist party[] are available satisfy the judgment against defendants (terrorist parties)") *aff'd* 609 F.3d 43, 49 (2d Cir. 2010) (TRIA § 201 "clearly differentiates between the party that is the subject of the underlying judgment itself, which can be any terrorist party…and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also 'any agency or instrumentality of that terrorist party.'"); *Weininger v. Castro*, 462 F. Supp. 2d 457, 484-87 (S.D.N.Y. 2006) (same).

However, TRIA § 201 did not provide a perfect solution because, *inter alia*, an entity is not "agency or instrumentality" of a foreign state unless it is owned directly by the foreign state. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474-77 (2003). Thus, for example, assets owned by a whole-owned subsidiary of a corporation wholly owned by a foreign state sponsor of terrorism are not subject to execution under TRIA § 201.

In order to solve this and other hurdles facing Americans holding judgments against state sponsors of terrorism, in 2008 Congress enacted yet another special enforcement provision designed to enable the satisfaction of such judgments, 28 U.S.C. § 1610(g):

The TRIA was designed to remedy many of the problems that previously plagued victims of state-sponsored terrorism; in practice, however, it led to very few successes. But while the TRIA did abrogate the *First Nat'l* holding with respect to "blocked assets," *Weininger*, 462 F. Supp. 2d at 485–87, that victory proved hollow once victims discovered that, at least with respect to Iran, "very few blocked assets exist." *In re Terrorism Litig.*, 659 F. Supp. 2d at 58.…

Against this desolate backdrop, Congress enacted [§1610(g)]. This new provision, in its entirety, declares:

> (g)     Property in Certain Actions.—
>
> (1)     In general.—Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—
>
> (A)     the level of economic control over the property by the government of the foreign state;
>
> (B)     whether the profits of the property go to that government;
>
> (C)     the degree to which officials of that government manage the property or otherwise control its daily affairs;
>
> (D)     whether that government is the sole beneficiary in interest of the property; or
>
> (E)     whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) United states sovereign immunity inapplicable.—Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the [TWEA] or the [IEEPA].

(3) Third-party joint property holders.—Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

28 U.S.C. § 1610(g).

*Estate of Heiser v. Islamic Republic of Iran*, ___ F. Supp. 2d ___, 2011 WL 3489109 at *4-5 (D.D.C. Aug. 10, 2011).

The key feature of FSIA § 1610(g) is the provision allowing judgment creditors to reach "an interest held directly or indirectly in a separate juridical entity." § 1610(g)(1). One Court of Appeals has explained the import of this provision:

Section 1083 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44…expanded the category of foreign sovereign property that can be attached; judgment creditors can now reach any U.S. property in which [a foreign state sponsor of terrorism] has any interest, 28 U.S.C. § 1610(g), whereas before they could reach only property belonging to Iran, 28 U.S.C. § 1610(a)(7).

*Peterson v. Islamic Republic of Iran*, 627 F .3d 1117, 1123 n.2 (9th Cir. 2010). (Emphasis added).

Thus, under FSIA § 1610(g), persons holding a judgment against foreign state sponsors of terrorism can enforce that judgment against any property interest of a foreign state, whether or not the interest is held directly or indirectly—*i.e.,* by a separate juridical entity.

**B.      TRIA § 201 and FSIA § 1610(g) Preempt New York State Law**

The Garnishees assert that the relief sought by the Judgment Creditors is barred at the threshold by New York state law, specifically, by certain provisions of New York's implementation of the Uniform Commercial Code ("UCC").

This argument should be rejected because TRIA § 201 and FSIA § 1610(g) are remedial statutes intended by Congress to preempt any contrary state or federal laws. Indeed, in *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525 (S.D.N.Y. 2010) and *Levin v. Bank of New York*, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011), Judge Marrero and Judge Patterson of this Court rejected the very argument raised by the Garnishees—*i.e.,* that the UCC bars enforcement against electronic funds transfers—and held that TRIA and the FSIA preempt any contrary provisions of New York state law. "If Congress had wished to exclude EFT's from the variety of assets subject to attachment, it could have done so." *Levin*, 2011 WL 812032 at *18.

For the reasons set forth in the decisions in *Hausler* and *Levin*, incorporated herein by reference, this Court, too, should reject the claims that New York's UCC bars enforcement. The Judgment Creditors note that decision of the Second

Circuit in *Weinstein*, 609 F.3d 43, which held that TRIA would preempt <u>even an</u> <u>international treaty</u> (*id.* at 53) and the recent decision in *U.S. v. Holy Land Foundation*, 2011 WL 3703333 (N.D. Tex. Aug. 19, 2011) which held that TRIA preempts contrary <u>federal</u> criminal forfeiture provisions, constitute additional support for the conclusion that the state law provisions of the UCC cannot bar this proceeding.

Indeed, it is well established that state laws cannot bar enforcement of federal rights. *See e.g. In re Monroe*, 282 B.R. 219, 220 (Bkrtcy. D. Ariz. 2002) (holding Arizona law "cannot be enforced against a foreign judgment, especially if it would extinguish a federal right (*i.e.* the right of a person injured by a RICO violation to complete recovery under federal law)."); *Williams v. Allen*, 616 F.Supp. 653, 658 (E.D.N.Y. 1985) ("It is not incumbent upon a federal court to apply a procedural rule of the forum state when doing so would effectively extinguish an important federal right."). *See Burks v. Lasker*, 441 U.S. 479, 479-80 (1979) ("[F]ederal courts must be ever vigilant to insure that application of state law poses no significant threat to any identifiable federal policy or interest…And, of course, this means that…specific aberrant or hostile state rules…will not be applied.") (Quotation marks and citations omitted).

State laws creating special property regimens are not exempt from federal supremacy over state laws interfering with important federal policy. For example, in *Walet v. Jefferson Lake Sulphur Co.*, 202 F.2d 433, 434 (5th Cir. 1953), the defendant, who had obtained profits on insider trading in violation of the federal securities laws, contended that only half of the profits were his, the other half being his wife's under

Louisiana's community property laws. The Fifth Circuit rejected that contention, stating that "[a]ny other rule would defeat the purpose of the statute here under consideration, at least in part, in community property states.... [F]ederal policy must prevail over the vagaries in local laws." Similarly, in *Wissner v. Wissner*, 338 U.S. 655, 661 (1950), a soldier's spouse claimed the proceeds of a federal military life insurance policy in which the soldier named his mother as sole beneficiary. The spouse argued that since she and her deceased husband had lived in California, a community property state, and since the husband's income which paid the policy premiums was community property, she was therefore entitled to the insurance proceeds. The Supreme Court rejected her argument because it would have undermined the intent of Congress: "However 'vested' her right to the proceeds under California law, that rule cannot apply to this insurance."

In sum, the New York UCC has no impact on this proceeding.

## C.   The Judgment Is Enforceable Under TRIA § 201 and/or FSIA § 1610(g)

The Garnishees assert that the judgment is not enforceable under TRIA § 201 or FSIA § 1610(g) for several reasons all of which are meritless, as discussed below.

As an initial matter, the Court should disregard any and all arguments raised by the Garnishees that are based on factual questions regarding the identity of the owners of the assets. The Judgment Creditors have had virtually no discovery regarding the identity of the owners of the funds, and have not had an opportunity to develop this information—which is in the hands of the Garnishees themselves and/or

the United States Treasury which blocked these assets because of their relationship to North Korea. Therefore, at this stage of the proceedings, the only issues properly before the Court are the <u>legal</u> questions relating to the application of TRIA and the FSIA.

The Garnishees assert that TRIA is inapplicable here because North Korea is not currently designated as a state sponsor of terrorism and TRIA uses the present tense. This argument should be rejected. It is well established that the use of the present tense should be construed as including the past tense where the context demands it. Here, construing TRIA as excluding the past test would render it inapplicable to terrorist <u>organizations</u>, because TRIA's definition of "terrorist party" includes any "group of two or more individuals, whether organized or not, which engages in, or has a subgroup which <u>engages</u> in, [specified terrorist] activities." *See* TRIA § 201(d)(4) (defining "terrorist party" as including  a terrorist organization as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act).

Clearly, a "terrorist party" does not need to be engaged in terrorism at the moment an enforcement proceeding is filed and throughout those proceedings in order to be subject to the provisions of TRIA. Thus, TRIA's use of the present tense clearly includes the past tense.

Garnishees also argue that TRIA § 201(a) applies only where the terrorist party's lack of sovereign immunity was established under FSIA § 1605(a)(7), whereas the judgment at issue was given under FSIA § 1605A. This argument fails for the simple reason that TRIA applies to a judgment entered either "on a claim based upon an act of terrorism" or "for which a terrorist party is not immune under section 1605(a)(7)." Here,

the judgment was entered on a claim based upon an act of terrorism; thus, it is irrelevant that the judgment was not entered under 1605(a)(7).

The Garnishees also argue that the judgment is not enforceable under FSIA § 1610(g), but their arguments are based entirely on their UCC claims and on factual arguments regarding the ownership of the assets—a question which, as explained above, awaits discovery.

**D.      Conclusion**

The Court should find that the judgment is enforceable under both the TRIA and the FSIA and direct that the Judgment Creditors proceed to discovery, following which the question of ownership should be briefed.

Dated:   Brooklyn, New York
         September 23, 2011

                                    Respectfully submitted,

                                    THE BERKMAN LAW OFFICE, LLC
                                    *Attorneys for the Petitioners/Judgment-
                                    Creditors*

                                    by:  _____
                                           Robert J. Tolchin,
                                           Of Counsel

                                    111 Livingston Street, Suite 1928
                                    Brooklyn, New York 11201
                                    718-855-3627

TO:     All parties by ECF